Filed 11/19/20  In re Chance P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re CHANCE P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | D075713 |
| Plaintiff and Respondent, | (Super. Ct. No. J241251) |
| v. | |
| CHANCE P., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Cynthia Ann Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestmen and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

In a juvenile wardship petition (petition), minor Chance P. (sometimes, Minor) was charged with one count of murder (Pen. Code,[1] § 187, subd. (a); count 1) and two counts of attempted murder (§§ 187, subd. (a) & 664; counts 2 and 3). It was further alleged that Minor personally discharged a firearm in the commission of count 1, proximately causing death to a person (§ 12022.53, subd. (d)); and personally discharged a firearm in the commission of counts 2 and 3 (§ 12022.53, subd. (c)).

Following an adjudication hearing, the court sustained the petition, finding true that Minor committed one count of second-degree murder (count 1) and one count of attempted murder (count 2). The court also found true the firearm enhancements attached to those counts. The court found not true the attempted murder charge in count 3 and dismissed that charge. The court committed Minor to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). The court determined minor's maximum term to be 40 years to life plus 27 years, which consisted of 15 years to life for the murder true finding and 25 years for the firearm enhancement; plus the mid-term of seven years for the attempted murder true finding and 20 years for the firearm enhancement.

Minor on appeal contends that the true finding on count 2 is not supported by substantial evidence; that the court abused its discretion in committing him to DJJ; and that his case should be remanded to allow the court to exercise its discretion to impose lesser-included firearm enhancements in counts 1 and/or 2. (See § 12022.5, subds. (b) & (c).) As we explain, we reject these contentions and affirm the court's disposition order.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

OVERVIEW

*Prosecution Case*

A former detective of the San Diego Police Department, Kimberly Collier was assigned to the homicide unit on April 29, 2018. Detective Collier testified that she participated in the investigation of the homicide involving victim Thanh P. by his then 15-year-old son, Minor. As part of her investigation, she reviewed video recorded by four surveillance cameras located both inside and outside of the home, including one mounted in the family's living room which captured video taken days before, and on the day of, the homicide.

Detective Collier reviewed video from April 26, three days before the homicide. She testified that at about 4:13 p.m., the video showed the following: "Dad in kitchen and storms into Chance's room, turns the light on and yelling at him about something and accusing him of lying. Chance gets up and opens closet door. Noise that sounds like slap happens. Dad still yelling. Chance put drops in eye."

A minute later, the video showed the following per Detective Collier: "Chance in view inside his bedroom near the closet. You can see dad slapping him on the back of the neck while he's putting in the eyedrops. Chance walks further into his room. His light goes off. Dad walks out of the bedroom."

Detective Collier testified that Thanh returned from a business trip on April 29, the day of the homicide. Detective Collier reviewed the video from that day, including at the time of the shooting. Portions of the video were played for the court, and transcripts of such clips were included in the record.

According to Detective Collier, in the video things seemed like "business as usual" until Thanh and his wife Nicolette started arguing. At about 4:36 p.m., the video showed Thanh going into Minor's bedroom holding

3

a laundry basket.  Detective Collier heard Minor and his father arguing, and then what she described as the sound of a "slap" or "thud-type noise."  The video next showed Nicolette running into Minor's bedroom, and her asking, " 'What happened?  Did you just fucking hit him again?' "

In the video, Minor could be heard explaining that "his father had hit him, his mother saw it, and his father denied it."  Per Detective Collier, the video next showed the parents leaving Minor's bedroom and continuing to argue.  Nicolette at one point told her husband, "I always have to yell at you all the fucking time[.]"

At about 6:00 p.m., Minor's step brother Stephen returned to the family home.  Minor at the time was in his bedroom, where he tended to spend a lot of time.  Detective Collier noted that although she could not see Minor on the video in his bedroom, it appeared from the audio that he often played video games online and conversed with others while doing so.  One such game Minor played was "Escape from Tarkov," which Detective Collier described as a "first-person shooter game."

At about 7:15 p.m., per Detective Collier the video showed Minor in his underwear coming out of his bedroom.  Minor went to the couch and began watching television.  A few minutes later, Minor got dressed and he and his father went out for a quick dinner.  The record shows between 8:30 and 8:35 p.m., Nicolette went outside onto the porch, leaving Minor and her husband alone in the master bedroom.  Nicolette then came back inside the home.

At 8:37 p.m., Minor left and then returned to the master bedroom.  The video showed Thanh then go to the back porch and return with a backpack, while Nicolette sat on the couch in the living room.  A minute later, the video showed Thanh dropping the backpack and entering the master bedroom.

4

Seconds later, the sound of gunfire can be heard on the video, with five shots in total in the span of about three seconds.

A transcript of the video showed Thanh and Minor had a conversation just before the shooting, after Minor refused to get his mother a charging cord for her cell phone. Next, the transcript showed Thanh screaming, "Ah! Ohhh!" and Nicolette yelling, "What happened?! What happened? Chancey! What are you doing? Chancey! What the fuck? What happened?" The record shows Minor responded, "Get out of here. Fucking now," as Nicolette had entered the master bedroom after hearing gunshots.

The transcript of the video next showed Nicolette stated, "Chance! Chance! What happened? Ste[ph]en!" Nicolette then asked, "Why?" and added, "Chance! Chance! I'm your mom. Chance! I'm your mom. What did you do? Chance! No! No! Chance! Chance! Chance! . . . ." Minor responded, "Fuck you!"

Seconds after the shooting, the video showed Minor coming into the living area and contacting his mother, after she fled the master bedroom. According to Detective Collier, it was "clear" from the video that Minor then pointed the gun directly at his mother, but that the gun was "locked back." (See appendix A attached to the end of this opinion, which is a still shot from the record taken from the surveillance video.) Based on her training and experience, Detective Collier opined this meant the gun was "either jammed and/or out of ammunition."

The video showed Minor then going back into the master bedroom with his mother following behind. The video next shows Nicolette leaving the master bedroom and running to Stephen's room; and Minor going back and forth between his bedroom and the master bedroom. Minor, after obtaining more ammunition from the master bedroom and reloading his gun, then fired

5

a round at Stephen's door.  Nicolette can be heard yelling from inside Stephen's room.  The video next showed Minor go back into the master bedroom "for a while," then go into his room and grab a backpack, then return to the master bedroom.  Shortly thereafter, Minor left the home and took the gun with him.

Police officers and emergency personnel responded to the scene.  They performed CPR on Thanh, but he was pronounced dead at 9:22 p.m.  An autopsy showed that Thanh had suffered "five separate gunshot wounds"; that four bullets were recovered from his body; and that he also had gunshot wounds to his left leg and to his right fourth finger.

Detective Collier interviewed Nicolette at the police station on the night of the homicide.  At that point, police still had not located Minor.  Nicolette disclosed during the interview that she believed her husband had entered Minor's bedroom and struck Minor a few hours before the shooting (as heard in the video).  Nicolette went into Minor's bedroom and confronted her husband, who denied hitting Minor.  Nicolette did not see any injury to Minor or evidence he had been hit.  According to Nicolette, Minor meanwhile continued to play video games.

Nicolette told Detective Collier that after Thanh and Minor returned home from dinner, everything "seemed normal," noting:  "They were both quiet, they weren't arguing.  They were bringing things in and putting them away.  Then Chance went into his room to play video games, and [Thanh] was continuing to take care of things at home" after his return from a business trip.

Immediately after the shooting, Nicolette told Detective Collier she went into their bedroom and "saw her husband lying in blood and wanted to help him, but her son had raised the gun towards her and she was afraid that

6

he would shoot her.[2] So she ran into Ste[ph]en's room." Detective Collier added that Nicolette believed her son had "tried" to shoot her. Detective Collier reiterated that in the video, she could see the "slide" on the gun used by Minor "locked back, which, based on [her] training and experience, could indicate that it's either jammed and/or out of ammunition." After running to Stephen's room, Nicolette heard another gunshot, and observed a round come "through" the door into Stephen's room.

Nicolette told Officer Collier that Minor and his father had a "good" relationship, that her husband loved Minor "a lot," and that he "provided and did a lot of things for Chance." Nicolette noted that Minor's "only" criticism of his father was that he was a "disciplinarian" and he "might have been a little rough" on Minor.

As to Minor, Nicolette described her son as nonviolent, an "introvert of sorts," who liked to play video games. She also told Detective Collier during the interview that Minor was "lazy and spoiled." As the interview continued, police apprehended Minor. When told of Minor's arrest, Nicolette responded

---

2    Nicolette's statements appear to suggest that during the incident Minor *may* have pointed a gun at her not once, but twice. The first time may have been in the master bedroom within seconds of the shooting. Indeed, as summarized *ante*, when Nicolette went into the bedroom after hearing gunshots, she can be heard (but not seen, as there was only audio from the master bedroom) repeatedly yelling "No! No" and "I'm your mom. Chance! I'm your mom. What did you do? Chance! No! No! Chance! Chance! Chance! . . . ." In addition, Nicolette at the disposition hearing testified that after hearing the gunshots, she ran into the master bedroom, opened the door, and saw Minor holding a gun and her husband lying on the floor. Nicolette further testified that Minor then pointed the gun at her, and said, " 'Get out of my house' "; and that even after watching the video, she was unable to remember a lot of the events and details that took place that night. In any event, the record shows Minor pointed the gun at his mother in the living room area, as shown in appendix A.

7

her husband "didn't deserve this" and she did not know why Minor had shot his father.

Detective Collier conducted a follow-up interview of Nicolette in May 2018. During this second interview, Nicolette told Detective Collier that on the night of the homicide, she confronted her husband after she thought she heard him "slap" Minor; that her husband denied striking Minor; and that Minor went back to playing video games. Nicolette also indicated that prior to this particular incident, there had been about three incidents when her husband had slapped Minor, but that she did not tolerate physical violence in her home. Nicolette reiterated before the shooting, she had never seen Minor acting in a violent manner.

Detective Collier asked Nicolette about the surveillance cameras. Nicolette stated one was located in Minor's room, pointing outdoors, because the family lived in a "lower-level apartment" and her husband was concerned someone could gain entry through Minor's bedroom window. Detective Collier testified she thought it was "odd" the family had surveillance cameras inside their home.

Officer Mark Lucchesi of the San Diego Police Department responded to the shooting and contacted Nicolette and Stephen. Officer Lucchesi was wearing a body camera, which he activated. Officer Lucchesi described Nicolette and Stephen as "frantic" and "hysterical," and both appeared to be in a "state of confusion."

A portion of the video from Officer Lucchesi's body camera was played during the adjudication hearing, with a transcript of such included in the record. The record shows Officer Lucchesi asked Nicolette what she saw when she went into the bedroom after hearing gunfire. Nicolette responded, "My husband was on the floor and my son was standing there with a gun."

8

When asked what happened next, Nicolette stated: "He pointed the gun at me so I ran,"[3] then added, "I ran to my son's room and we closed the door."

Officer Enri Brown of the San Diego Police Department also responded to the scene of the shooting. He, along with other officers, entered the apartment at 9:02 p.m. through a sliding-glass door. Officer Brown activated his body-worn camera. Portions of the video from his camera were played in court, with a transcript from that video included in the record.

Officer Brown testified that he went into the master bedroom and found the victim at the foot of the bed, bleeding. Officer Brown began chest compressions until emergency personnel took over. In the closet of the master bedroom, Officer Brown saw a drawer to a cabinet open. Officer Brown found four shell casings and a spent bullet on the floor, near the victim. In the first drawer of the cabinet officers found a nylon gun case but no gun.

Officer Ron Van Cleave of the San Diego Police Department also responded to the shooting. At about 1:00 a.m. the next day as he was driving back to the substation, dispatch reported that another officer had contacted Minor in a commercial area, after Minor had been seen hiding underneath a guardrail. Officer Van Cleave proceeded to the area to assist other officers.

On arrival, Officer Van Cleave saw Minor was handcuffed, but was still wearing his backpack. Officers already had recovered the gun from Minor's person, which was identified as a Glock 19, and an additional magazine from the front pocket of Minor's sweatshirt.

Officer Van Cleave testified he "cleared" the gun by removing a round from the gun chamber, which meant the gun was ready to fire, and the magazine that contained additional rounds. Officer Van Cleave searched

---

[3]     See footnote 2, *ante*.

9

Minor's backpack, after officers cut the straps and removed it from Minor. Inside he found "loose rounds," "boxes of ammunition," and an additional magazine containing more rounds.

A criminalist from the San Diego Police Department crime laboratory testified he fired the gun recovered from Minor's person nine times; that in each instance the gun worked properly and safely; that in using this type of a weapon, a person either has to release the slide of the gun, which will chamber a round, or pull the slide rearward, "and let it go forward"; but that in either case, the gun user "has to do something to chamber a round." The criminalist testified the magazines recovered from Minor had a 10-round capacity.

The record shows the criminalist was shown a portion of the video immediately before and after the shooting. In the video taken from the camera located in the living room area, the criminalist testified there was a "clicking" noise right after Minor told his mother to "Get out." The criminalist testified there were at least three or four similar sounds during the incident, and these sounds may have been the result of a round being chambered in the gun and the gun-slide moving forward. After a few of the clicking sounds, the criminalist heard a "lighter" sound coming from the gun. The criminalist opined this lighter sound was likely when Minor was either removing a magazine or reinserting a magazine into the weapon.

San Diego Police Department detective Maria Delgadillo responded to the shooting scene at about 10:30 p.m. After obtaining a search warrant, Detective Delgadillo along with other officers conducted a lawful search of the home. In the master bedroom, they found Thanh's body, along with blood splatter, expended bullet casings, and an unexpended bullet. On the floor in the bathroom of the master bedroom, they found another bullet casing,

10

another unexpended bullet, an empty "ammo box and a plastic ammo-like case." In Minor's room they found an airsoft rifle in its nylon case located on the floor, at the foot of his bed.

Detective Delgadillo testified they also recovered an additional shell casing in the dining/living room area of the home, close to the hallway that led to Stephen's bedroom. Detective Delgadillo located a bullet hole in Stephen's bedroom door, just above the doorknob. She noted the bullet went through Stephen's "bedroom door into the opposing wall. So it went straight through the door . . . hit the wall that goes to the outside of the apartment," and remained lodged in the wall. Detective Delgadillo found the bullet's trajectory appeared to be slightly downward from the point it passed through Stephen's door to where it ended up in the wall. She estimated the bullet entered Stephen's room about four feet off the floor.

Investigator Robert Guaderrama of the San Diego District Attorney's Office reviewed about 14,400 minutes of video footage from Minor's home, dating back to about 10 days before the April 29 shooting. Investigator Guaderrama testified that based on his review of such extensive footage, Minor spent "a lot" of time in his bedroom playing video games. Portions of the video surveillance were played for the court, with transcripts accompanying such clips.

On April 20, or nine days before the homicide, video recorded a conversation between Minor and his father. During this conversation, father could be heard telling Minor to do his "chores," including giving Minor instructions about putting things away and telling Minor to clean Minor's phone. According to Investigator Guaderrama, in this particular video clip and in many others, Minor's father can be seen serving Minor food.

11

Toward the end of this conversation, after turning on the television, Minor states, "Yes, I'm going to drink my [unintelligible]. [¶] He's going to die anyways, so." Minor's father replies, "Huh?" to which Minor answers, "Never mind." Investigator Guaderrama testified that when Minor made this statement, the video showed Minor was pointing toward his father, who was headed to the master bedroom.

In another video recorded on April 24, Minor's father repeatedly demanded that Minor get off his computer, at one point yelling, "Get away from your addiction," then yelling at Minor to do his homework. Inspector Guaderrama testified that in addition to "verbal discipline" as displayed on April 24, there were other instances when Minor's father physically disciplined Minor, adding, "One was a face slap [to Minor] and another one was a slap to the back of the head."

In the latter incident, it appeared Minor's father was upset because Minor was wasting prescription eyedrops. Inspector Guaderrama, however, noted that although Minor's father was a "disciplinarian," the video footage showed he was not a "strict disciplinarian"; and that, although Minor's father on "occasion[]" engaged in "physical touching" of Minor, there was not "a whole lot" of such touching when compared to all of the video the inspector reviewed leading up to the homicide.

On further questioning, Inspector Guaderrama stated that the face slap to Minor's face was "soft[]" and occurred only "one time"; that at another point, father used a "dish towel" to hit Minor on the head; and that Minor's father kicked Minor "in the behind" once after Minor did not do what his father had asked. The record shows Minor's father on other occasions shortly before the homicide threatened to turn off the Internet to the "whole house" after Minor refused to follow directions.

12

Investigator Vince Deocampo, also of the San Diego District Attorney's Office, testified he reviewed the contents of Minor's cellphone. Investigator Deocampo found "hundreds" of photos and images on the phone—including from Internet searches—related to guns, such as "photos of real guns, airsoft guns, video games like a character holding a gun." Other images found on Minor's cellphone included a picture of a Glock 19 downloaded on March 7, 2018, from the Glock website, which was the same or similar model Minor used in the homicide; a picture of an AK-47 rifle downloaded on April 18, 2018 with the caption, "How come everyone wanna be your friend soon as you pull out one of these in class"; and news stories relating to guns and shootings such as "school shootings and some Internet searches on like a wife pulling out gun to protect her husband, open carry of guns, and some shootings with cops, an undercover cop," among many other images and subject matters.

Investigator Deocampo also found on Minor's phone a "note section" where on March 12, 2018, Minor created lyrics to accompany rap music. Investigator Deocampo noted Minor's song was "about having a gun, an AR-15, a Glock, killing people." In a "Summary" section of the song, Minor wrote, "Where the real [Minor's last name] he's history," then the following lyrics:

"Where the real [Minor's last name] he's history
"Have to be sufficient on the thinking me
"Losing cash cause we been sinking gs
"Asking can we just kill some people please
"Big ass stick everywhere that's the real dream
"Code 9 has straps yes this a real thing
"And yes we on the block 3 man team

13

*"Having to rely on being friends*

*"Having to rely on smokin green*

*"[¶] Having to rely on the hood scene*

*"Having to rely on the ar 15* [i.e., a rifle]

*"Been bouncing with the glock*

*"Code 9 on the block*

*"Extended mags fuck stocks*

*"Mira Mesa Molly rock*

*"Better make sure your shy locked*

*"Boy going to get dropped*

*"3 man team*

*"Luca S[.] and me*

*"Just bought a factory key."*

Defense Case

Minor testified in his own defense.[4] As relevant to the issues on appeal, Minor testified that after he shot his father, he exited the bathroom and was "surprised to find [his] mom." Minor added, "In reaction, I extended my—the pistol I was holding into her face."[5] Minor testified as he did so, he was "fumbling" with the gun and "wasn't 100 percent" sure how many

---

[4]    The record shows the defense called several witnesses to testify at Minor's adjudication hearing, including Nicolette, as noted *ante*. Such testimony, to the extent relevant to the issues on appeal, is discussed *post*.

[5]    Again, it is not clear if Minor is testifying about the incident in the living room area caught on video, which clearly shows him pointing the gun at his mother (see appendix A); or *perhaps* about an earlier incident that was not caught on video but only decipherable from the audio, when Nicolette confronted her son in the master bedroom, just seconds after the shooting. (See fn. 2, *ante*.)

14

unexpended bullets remained inside it, as the gun was already loaded when he grabbed it from the cabinet in the master bedroom.

Minor testified he fired into Stephen's door because he knew his mother was inside the room, yelling. Minor explained, "Well, she—she was—I wouldn't say behind the door, actually. She was kind of opening the door, coming out, to try to talk me down, I guess. I knew she was going to talk me down. [¶] And my attempts to scare her earlier, I guess, didn't work and I knew I had to do something to scare her more drastically, at least, to—so I could get away." As such, he "fired a shot."

Regarding the location of the shot, Minor testified: "I tried to fire the shot down towards the left, but my marksmanship is not that great so it ended up closer to my mother than I had hoped." Minor further testified he did not realize Stephen was also inside the bedroom until after he had fired the shot, when he heard Stephen from behind the door talking to a 911 dispatcher.

After he fired the shot into the door, Minor went back into his bedroom, emptied his school backpack, and then "went back into the [master] bedroom, where [he] retrieved more ammo from the safe." Minor then went back into the living room area and told his mother "Fuck you." When questioned why he said that, Minor responded, "I didn't want her to get the impression that I was already gone, because I wasn't, and I wanted her, again, to stay in there. So I had to keep scaring her, basically."

Minor on cross-examination testified that he had fired the airsoft rifle purchased for him by his father about five or 10 times; that his father also had twice taken him to the shooting range to fire the Glock; that before his father took him to the range, his father made sure Minor knew how to clean and load the weapon; that Minor had a Glock windbreaker he liked to wear;

15

that he thought school shootings were "funny," but in a "scary[-]funny" way; and that he believed his father was "unfair" for taking away his Internet access when he was being disciplined.

Regarding the shooting, Minor testified he went into the master bedroom and took the gun from the drawer not because he wanted to shoot his father, but instead for protection as he had made the decision to run away from home at least for the night and believed he needed the gun for personal safety. However, after his father returned to the master bedroom, Minor came out of the bathroom off the master bedroom holding the gun in both hands, near his sternum, and confronted his father.

Minor testified he next saw his father lunge for the gun. Minor in response claimed it "was reactionary" when he fired the first shot, hitting his father in the chest. Minor testified he closed his eyes before he fired the gun. Minor then fired the gun a second time, again striking his father in the chest. Minor testified he fired the gun a second time because he then was unsure where his father had been hit with the first shot. Minor estimated he was about six feet away from his father when he fired the two shots.

Minor testified he fired the gun three more times because his father "came at [him] again." Minor explained it was also "reactionary" when he fired the next three rounds at his father, as Minor was "afraid" of his father, and felt he was still "in danger." After he fired five rounds, Minor testified he ran into the living room and confronted his mother.

The following colloquy then took place:

"Q. [Prosecutor]: And you run into your mom, right?

"A. [Minor]: Yes.

"Q. And you point the gun at her?

"A. Yes.

16

"Q. And you try to shoot her?

"A. No.

"Q. You're clicking something, right?  We can hear it in the video.

"A. I'm—I'm just fumbling with the gun.

"Q. You had no idea how many bullets were in that gun when you started firing at your dad, did you?

"A. Yes.  But I—I actually thought there were more bullets.

"Q. How many bullets did you think were in the gun?

"A. Seventeen.

"Q. Why did you think that?

"A. When I play [the videogame] 'Escape from Tarkov,' there's 17 in the Glock.  I thought it was the same Glock.  But, I mean, I didn't think it was—I knew it was a different Glock, but I knew that one Glock has 17. [¶] So I don't know.  It was just kind of like one Glock has 17, but this one could have had any number amount. [¶] I didn't know.

"Q. So when you came out and pointed the gun at your mom, you still thought it was fully loaded, full of ammunition, right?

"A. Yes.

"Q. Because you had only shot five times, right?

"A. Yes.

"Q. So you thought there 12 more bullets in there?

"A. I thought there were a maximum of 12 more bullets.

"Q. And you pointed the gun directly at her, didn't you?

"A. I wouldn't say directly at her.  It's—it's reactionary.  So it's kind of like there's a movement.  So I—I can't say pointed it directly at her.  I just know there was a movement.  I extended my arms."

17

After the prosecutor again played the video for Minor showing him pointing the gun at his mother immediately after he ran into the living room area, the record shows the following exchange took place:

"Q. You're pointing the gun directly at your mother, aren't you Chance? This is at 8:36:28 [p.m.]

"A. Yes.

"Q. And you have . . . your arm's fully extended—or it's bent here. But when you first come out of the room, your arm is fully extended, right?

"A. Yes.

"Q. And that's how you shoot a gun—right? Holding it out with your arm fully extended?

"A. That is a way you can shoot a gun, yes.

"Q. But the gun was out of ammunition, right?

"[¶] . . . [¶]

"A. No.

"Q. It wasn't out of ammunition?

"A. No.

"Q. Continue to play [the video]. [¶] What are you doing there, Chance? You are—you hear the gun, you're messing with the slide. I'm pausing [the video]. . . . What were you doing there?

"A. You got to understand that I—I had just shot my father. My adrenaline is rushing. I see my mother, and as you can see, I'm kind of panicked. So I really think it's just kind of like a fidget-type action where I'm just overly excited.

"Q. So you weren't trying to shoot her just then?

"A. No."

Minor went on to testify that after the confrontation with his mother, he went back into the bathroom in the master bedroom; that once in the bathroom, he did not reload the gun, but instead was merely "thinking" as he "wanted to get away clean"; that in the bathroom he continued to "fumbl[e]" with the gun, but knew "[i]t wasn't out of ammo "; and that while listening to the video of the "clicking noises" from the gun, he claimed it was the result of him "fumbling with the gun," as he "cocked it . . . like so many times." When asked why he was fumbling and cocking the gun, Minor replied, "I'm overly-excited, I guess, would be the reason I'm fumbling with it, yes."

Regarding the shot into Stephen's door, Minor stated that he felt he "had to do it," although it "wasn't [his] plan for that to be another move"; that when he fired into the door, he knew his mother was behind the door and was in the process of opening it; that the distance between the door and where he was standing when he fired was about 17 feet; that when he shot the weapon at the door as his mother was in the process of opening it, he "knew that shooting that gun could kill someone," although he claimed he fired the weapon merely to "scare" his mother; and he confirmed after firing the weapon at the door, he told his mother "fuck you."

Minor on cross-examination further testified he went back into the master bedroom, put additional ammunition in his backpack, and saw his father lying motionless on the floor. When asked why Minor did not use the airsoft rifle instead of the Glock to protect himself, including from his father, Minor noted the airsoft rifle merely fired BB's, and added, "It's going to hurt someone, but like it's just going to hurt"; and, "I needed something that people would take me seriously."

As noted *ante*, Minor's mother Nicolette also testified on her son's behalf at the disposition hearing. As pertinent to the issues on appeal, she

19

testified that after she heard the gunshots coming from the master bedroom, she ran into that bedroom and saw her husband lying on the floor. He did not appear to be moving. Nicolette saw Minor standing in the bedroom holding the gun. As noted *ante*, according to Nicolette Minor then pointed the gun at her, and said, "Get out of my house."

Court's Ruling

The court as trier of fact rejected the defense's portrayal of the victim Thanh "as an abusive ogre whose unceasing and violent abuse of [Minor] left [Minor] with no choice but to kill his father," finding that depiction contrary to the evidence. The court noted that there was no testimony of any "actual violence" by Minor's father against Minor; that his father may have given Minor a "smack upside the head" when Minor, for instance, would not take his eye medication; but that it did not consider such action by Thanh to be "actual violence" against his son. The court also found that Thanh's raising of his voice, imposing punishment or "limitations for trivial transgressions" did not show that Thanh was verbally abusive toward his son.

Regarding count 1, the court found Minor did not act in self-defense when he killed his father, as the evidence did not support a finding that Minor was in imminent danger of being killed or suffering great bodily injury. In making this finding, the court determined Minor was not credible when he testified that his father had struck him "three minutes" before the shooting, or that his father minutes before the shooting had gone to the garage "to get something . . . to do harm to [Minor] when what [Thanh] did, which is born[e] out by the—the tape of that particular transaction, was he went to look for and he found a telephone charger for his wife."

The court also found that when Thanh returned from the garage and walked into the master bedroom, he was "armed with nothing"; that he was

20

wearing a T-shirt and a pair of shorts, and thus had "nothing up his sleeve, he had nothing in his hands, nothing whatsoever"; and that within seconds of entering the bedroom, Minor fired five shots, killing his father. The court thus found any fear by Minor that he was about to suffer death or great bodily injury was unsupported by the evidence.

The court also found that imperfect self-defense did not apply because as was the case of self-defense, Minor was not in imminent danger of being killed or suffering great bodily injury; that heat of passion was not an excuse for the homicide, as there was no provocation when Thanh merely "reprimanded" Minor for not doing his chores "year after year"; and that, merely because Minor, like many teenagers, did not like being told what to do by a parent, and that Minor may have "reached the boiling point" as a result, there was insufficient provocation to "cause a person of average disposition to act rashly and without due deliberation."

The court also found that Minor did not close his eyes and fire the weapon as he claimed, as such a finding was inconsistent with Minor firing three shots "in a straight line . . . in a parallel course." Rather, the court found the impact of the rounds showed Minor "aim[ed] the gun and sho[t] it three different times."

The court as to count 1 found the petition sustained and made a true finding for the charge of murder. The court next addressed whether the murder was first or second degree. The court found Minor was not lying in wait when he killed his father. The court therefore turned to whether the murder was willful, deliberate, and premeditated.

Although the court found Minor's killing of his father to be willful, it did not find the killing was the result of deliberation, or the "careful weighing of the considerations for and against the choice." Instead, the court found

21

Minor "was acting under some sort of mindset that, at least in this court's view, while [it] doesn't eliminate the express malice nature of this thing that there was an intent to kill, I don't think there was a careful consideration of the—of the determination to kill, and, as a result, this is murder of the second degree." The court nonetheless made a true finding that Minor, in connection with count 1, used a handgun within the meaning of section 12022.53, subdivision (d), as alleged in the petition.

The court next turned to count 2, the attempted murder of Nicolette. To make a true finding on this count, the court noted that Minor needed to take "at least one direct but ineffective step toward killing Nicolette." The court found Minor took *two* such steps. It explained: "When [Chance] came out of the bedroom and Nicolette is running toward the bedroom to see what happened, she contacts Chance. He has the gun pointed directly at her with his finger near the trigger, and then when the gun doesn't fire, he starts playing with the slide as he's running around her." (See appendix A.)

The court then addressed why Minor went back into the bedroom after pointing the gun at his mother: "He goes back into the bedroom to do what? Well, what we found from the testimony of the firearms expert is he's out of bullets, in all likelihood, or the mechanism is jammed. The time frame between him going back into the . . . bedroom and the bathroom and him coming out later on suggests that it was—he was out of bullets. So he's reloading, putting a new clip in, or putting new bullets into the other magazine.

"And during that time, then Nicolette goes into Ste[ph]en's room, and then it goes from there. [Minor] comes out, looks down at Ste[ph]en's room, makes a comment to his mother, points the gun again at chest height and shoots through the door.

"This was not done in a panic. This was done deliberately. And so I find that that would be the second ineffective step toward killing.

"It also requires an intent to kill, and, yes, I find beyond a reasonable doubt that there was an intent to kill. When Chance came out, he wasn't just pointing the gun in a panic and just shooting it anywhere. He took—assumed a shooter's stance and then aimed right at the door where he knows his mother had gone through because he could still hear her in that room and he fired. And as a result, I'm making a true finding that count 2 has been . . . sustained, and sustained in the petition that there was use of a handgun within the meaning of [section] 12022.53(c)."[6]

DISCUSSION

I

*Sufficient Evidence Supports the True Findings on Count 2 of Attempted Murder of Nicolette*

A. <u>Guiding Principles</u>

" 'The standard of appellate review for determining the sufficiency of the evidence is settled. On appeal, " 'we review the entire record in the light most favorable to the judgment [or order] to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [ Citation.] In conducting such a review, we " 'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" [Citations.] "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive

---

[6]    As noted, the court did not make a true finding on count 3, attempted murder of Stephen, which finding the People have not challenged on appeal.

23

province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." [Citation.]' " (*People v. Harris* (2013) 57 Cal.4th 804, 849 (*Harris*).)

As correctly noted by the juvenile court, an "attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Canizales*, *supra*, 7 Cal.5th at p. 602; see *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*) [noting that attempted murder requires specific intent to kill, or express malice, " 'and the commission of a direct but ineffectual act toward accomplishing the intended killing' "].) "[E]vidence of motive is often probative of intent to kill[,]" but it "is not required to establish intent to kill[.]" (*Smith*, at p. 741.)

"For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8; accord, *People v. Garton* (2018) 4 Cal.5th 485, 514.)

24

B. <u>Analysis</u>

Here, the juvenile court as trier of fact found that Minor intended to kill his mother Nicolette on *two* separate occasions during the incident. Such a conclusion is supported by substantial evidence, as we have summarized in detail *ante*.

First, the record shows immediately after Minor shot his father five times from a distance of about six feet, his mother Nicolette ran into the master bedroom to find out what had happened. Audio from the surveillance video recorded Minor saying, "Get out of here. Fucking now." It is not clear whether Minor then pointed the gun at Nicolette, as she claimed when interviewed by Detective Collier on the night of the shooting, or as she testified at the disposition hearing (see fn. 2).

In any event, Nicolette left the bedroom. Minor followed. He then confronted his mother, and—with a picture being worth 1000 words—extended his arms and pointed the gun directly at her. (See appendix A.) The court found the gun was either jammed, or more likely, out of ammunition, as a clicking noise could be heard on the video as Minor pointed the weapon at her.

The court based its finding on expert testimony, which testimony in turn was based on the video footage showing the gun's slide in the locked-back position as Minor assumed a "shooter's stance"; and on the audio portion of the video, where clicking noises could be heard coming from the gun as the minor pointed the weapon directly at Nicolette, with his finger on the trigger. Such evidence is more than sufficient to support the findings of the court that Minor intended to kill his mother; and that he took a direct, but ineffectual step, toward accomplishing the intended killing of her. (See *Canizales*, *supra*, 7 Cal.5th at p. 602; see also *Smith*, *supra*, 37 Cal.4th at p. 741 [intent "may in

many cases be inferred from the defendant's acts and the circumstances of the crime"].)

Second, after Minor pointed the gun at his mother while they were in the living room and was unable to fire the weapon because it was either jammed, or, more likely, out of ammunition, Minor went back into the master bedroom. The court found once in the master bedroom/bathroom, Minor reloaded the weapon, which finding is amply supported by the record, based on the location of the ammunition inside the bedroom; the unexpended bullet police found on the bathroom floor; and the empty "ammo box and a plastic ammo-like case" they also recovered from the bathroom.

Not only did Minor reload the weapon, he also dumped out the contents of his backpack and filled it with another magazine and additional ammunition. Minor then returned to the living room area. The video showed the gun-slide of the Glock was no longer in the locked position. The record shows Nicolette was yelling from behind Stephen's bedroom door. Minor saw that his mother was attempting to open the door. Minor in response fired a round into the door, about four feet off the floor. The round went through the door and lodged in the wall inside Stephen's room. Minor then told his mother to "fuck off," claiming he did so because he wanted his mother to know he was still inside the home and to facilitate his "clean" get-away.

We conclude that such evidence is more than sufficient to separately support the finding of the court that Minor intended to kill his mother when he fired the shot at Stephen's door, knowing his mother was inside the room and was attempting to open the door; and that firing a bullet, which entered the door and bedroom at about four feet off the floor, was a direct, but fortunately, ineffectual step toward accomplishing her intended killing. (See *Smith*, *supra*, 37 Cal.4th at pp. 741–742 [finding that the act of firing a

26

weapon toward a victim at close range in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient evidence to support an inference of intent to kill; that the fact the "bullet misses its mark or fails to prove lethal [is not] dispositive"; and that the " ' "fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does *not* compel the conclusion that he lacked the animus to kill in the first instance" ' " (italics added)].)

Minor nonetheless contends the evidence was insufficient to support a finding he intended to kill his mother. As summarized *ante*, Minor testified that the gun was neither out of ammunition nor jammed when, just seconds after killing his father, he confronted his mother, assumed a "shooter's stance" and pointed the weapon directly at her; that the clicking sounds made by the gun were merely the result of his "fumbling" with the weapon; and that when he fired a shot at Stephen's door as his mother was opening it, he did so merely to scare her and let her know he was still in the home, so that he could make a "clean" get-away.

Minor's contention is nothing more than a request that we view the evidence in the light most favorable to him. (See *Harris*, *supra*, 57 Cal.4th at p. 849 [concluding a court of appeal reviews for substantial evidence the entire record in the light most favorable to the judgment or order, and further concluding in conducting such a review, it presumes " 'in support of the judgment [or order] the existence of every fact the trier could reasonably deduce from the evidence' "].)

It is axiomatic that issues of witness credibility are reserved for the trier of fact. (See *Harris*, *supra*, 57 Cal.4th at p. 849.) As noted, the court rejected certain portions of Minor's testimony, including that there was ammunition in the gun when he pointed it at Nicolette but did not fire; and

27

that he merely went back into the master bedroom/bathroom to think but not to reload the gun.  Although the court might have concluded from Minor's testimony that he lacked an intent to kill for purposes of count 2, on this record it was not compelled to do so.  Because our task on review is confined to determining whether, viewed in the light most favorable to the prosecution, the trier of fact's true findings are supported by substantial evidence, we reject Minor's contention the evidence was insufficient to support the finding he intended to kill Nicolette.  (See *ibid.*)

In light of such evidence and our decision, we also conclude there was more than sufficient evidence to support the finding of the court on count 2 that Minor personally discharged a firearm in the commission of the attempted murder of Nicolette.  (See § 12022.53, subd. (c)).  Indeed, as noted Minor fired a bullet into Stephen's door knowing his mother was inside the room and was attempting to open the door to "talk" Minor "down"; and Minor admitted if the bullet struck Nicolette, it could have killed her.

## II

*The Court Properly Exercised its Discretion in Committing Minor to DJJ*

Minor next contends the court abused its discretion in committing him to DJJ[7] because there allegedly was insufficient evidence to show a probable

---

[7]    Existing law requires that DJJ be removed from the Department of Corrections and Rehabilitation and "reestablish[ed]" by July 1, 2020 as the Department of Youth and Community Restoration under the California Health and Human Services Agency.  (Gov. Code, § 12820, subd. (a); see Welf. & Inst. Code, § 1710.)  Due to COVID-19, and following a declaration of a state of emergency, the Governor of California issued an executive order delaying the deadline for DJJ's transfer to July 1, 2021.  (Office of Governor Gavin Newsom, Executive Order N-40-20 (Mar. 30, 2020) <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.30.20-N-40-20.pdf> [as of Sept. 15, 2020], archived at: <https://perma.cc/6Z7X-LP3G>.)

benefit to him and less restrictive alternatives were inappropriate.  We find this contention unavailing.

A.  Additional Background

Deputy Probation Officer Robert Pinedo of the San Diego Probation Department prepared the Juvenile Field Services social study of Minor (sometimes, Social Study) in connection with Minor's April 5, 2019 disposition hearing.  In preparation for Minor's Social Study, Officer Pinedo reviewed among other records Minor's criminal and personal history; family history; school records; abuse history, including substance abuse; physical and mental health history; records from juvenile hall; and the 16-page psychological evaluation of Minor conducted by Dr. Francesca Lehman on November 15, 2018.  In addition, Officer Pinedo also interviewed Minor and Nicolette in preparing the study.

Officer Pinedo testified he next considered all of this information in assessing Minor using the San Diego Risk and Resiliency Checkup tool.  He testified this tool helped to assess "possible recidivism" of Minor and determine Minor's specific needs in developing a case plan for his rehabilitation.  Using this tool, Officer Pinedo found Minor's top two assessed areas of need were "social connection and family functioning."  Based on this tool and all the other information reviewed by Officer Pinedo, he recommended in the Social Study that Minor be committed to DJJ.

When asked why he made this recommendation, Officer Pinedo testified, "I just felt [Minor] could get the mental health needs . . . at the program.  It also was an appropriate program to deal with possible recidivism in the future and ensure that he is properly rehabilitated before he returns to the community."  Officer Pinedo added that in making his recommendation,

he also considered community safety and appropriate consequences for the murder and attempted murder Minor committed.

Officer Pinedo testified that at the request of the court, Minor was screened for acceptance into a short-term residential treatment program. However, the screening committee found Minor did not meet the criteria for such a placement.

DJJ also screened Minor and determined he could benefit from that placement. In connection with the DJJ screening, Officer Pinedo met with DJJ officials to learn more about its programs and whether they would be the best fit for Minor. Officer Pinedo testified that all potential programs available to Minor were considered, including those less restrictive than DJJ, and that only after considering all such programs was DJJ selected to be the program best-suited for Minor.

Officer Pinedo was also asked whether Minor was screened for the Youth Offender Unit (YOU) run by probation, which unit was located in the same physical facility where Minor was then being housed. Officer Pinedo testified Minor had been screened for YOU, but was found not to be a fit for that particular program.

Officer Pinedo nonetheless recognized that since being housed in juvenile hall, Minor had been doing "well," including earning all A grades without any history of discipline; that Minor's risk and resiliency score showed he was a "low risk to recidivate"; and that if housed at YOU, he could participate in conjoint family therapy with his mother on a local basis, as recommended by Dr. Lehman in her psychological evaluation report.

Officer Pinedo and his supervisor nonetheless recommended in the Social Study that Minor be committed to DJJ not only because of the wide variety of programs available to Minor, but also because of the seriousness of

his offenses and for community safety. Officer Pinedo noted that the in-custody portion of YOU was a maximum of 485 days, and that its jurisdiction terminated when a minor reached the age of 21, unless the minor violated probation. He further noted the in-custody portion of the program could be shorter than 485 days, as YOU participants could earn credits and there were, in any event, three different type of plans under such a program, including one as short as six months.

Agent Michael Farmer of the California Department of Corrections and Rehabilitation, Division of Juvenile Justice, testified he worked as an "intake and court services liaisons at DJJ headquarters." Agent Farmer testified that DJJ had three facilities and a conservation/fire camp; that typically he receives a call from a probation officer seeking to screen a minor's eligibility for DJJ; that once a minor is accepted into DJJ, he or she is accessed for 45 days at the reception center in Stockton, California; that during the initial assessment, the minor is screened psychologically, meets with education and medical staff to develop education and medical plans, and meets with a social worker who does a clinical evaluation and a risk assessment to determine the needs and services a minor likely will need while at DJJ; and that once all such information is gathered, the minor and his or her family are consulted to "develop an initial individualized treatment plan for that youth, for his or her stay while at DJJ."

Agent Farmer noted that in addition to developing a high school graduation plan, a minor in DJJ can continue with his or her education and participate in college courses "both in person and via correspondence courses with the college." DJJ also offers many career technical education courses including in culinary, landscape, small-animal care, carpentry, and similar type jobs.

31

Agent Farmer described various intervention plans available at, and in some cases, required by, DJJ. One required program is a 52-week intervention addressing such subject matters as "deescalating an argument, giving and accepting a compliment, basic social skills actually taken out . . . [and] aggression replacement therapy training but not specific to aggression." Other such programs or interventions include areas such as "violence and aggression, peer influence, or social networks and substance abuse."

DJJ also creates an individual counseling and mental health plan for each minor, based on all the information obtained about the minor and his or her family. Agent Farmer noted minors and their families receive individual counseling with a psychologist. Family members are allowed to be physically present for counseling, as DJJ involves a minor's family from the beginning of a minor's rehabilitation; or, if unable to be physically present, by participating by "Skype and other technologies to be able to facilitate counseling and interactions with the family." Counseling at DJJ includes "trauma-focused cognitive behavioral therapy," because, as Agent Farmer further noted, the majority of minors coming into DJJ have some sort of "trauma history."

Once discharged from DJJ, a minor engaged in any career technical education courses is connected to those working in such fields, including local labor unions, to help the minor obtain additional training and begin working in his or her area of interest. A minor also can participate in DJJ's fire camp program, where he or she is trained by Cal Fire, Department of Forestry, in conservation efforts and firefighting, including obtaining a certificate that, upon discharge, helps the minor further his or her education or obtain a job.

Prior to discharge from DJJ, a minor will be assigned to a "specific reentry agent" who creates a plan for the minor to reenter the community.

According to Agent Farmer, the reentry agent coordinates with the local probation departments to facilitate what he described as a "warm handoff" of the minor back to probation in the county of commitment, so the minor can receive services tailored to his or her needs.

At the conclusion of Agent Farmer's testimony, the court accepted into evidence exhibits A through H, which were informational documents from DJJ that corroborated the witness testimony. The court then heard from Thanh's sister, Catherine W., who noted how distressing it was to "hear stories of [her brother's] character dragged out here in public [in front of television cameras], for his reputation to be in question, despite the fact that he was the victim" and his life was "taken violently by his own son" in such a "deeply painful and senseless" manner.

At the close of testimony, the court heard oral argument. The prosecutor asked the court to adopt the recommendation of probation that Minor be committed to DJJ based on a multitude of factors, including the best interests of Minor and the public. The prosecutor noted alternatives to DJJ were considered by probation, including residential treatment and YOU, but probation determined these alternatives were inappropriate for Minor based on a variety of factors including the seriousness of his offenses. Finally, the prosecutor noted DJJ had a number of rehabilitative programs that would help Minor, including "violence and aggression counseling," "family counseling," all while meeting Minor's educational needs with a focus on Minor's reentry into the community.

Defense counsel argued Minor was eligible for YOU and should be assigned to that program, which was less restrictive than DJJ. Defense counsel further argued placing Minor in YOU would facilitate family

counseling, as Minor would be housed in San Diego County, which would not be the case if assigned to DJJ.

As noted *ante*, the court ordered Minor to be placed with DJJ. In so doing, the court noted it had presided over the adjudication of Minor; had read the People's dispositional statement and attached exhibits, and the probation report and attached exhibits, including Dr. Lehman's confidential 16-page report; and had considered the witness testimony and the victim impact statements, including from Catherine W., and the argument of counsel, all of which were presented at the disposition hearing.

The court noted that, although Minor preferred less restrictive alternatives to DJJ, such alternatives were not in Minor's best interest because Minor's "mental and physical condition and qualifications render it probable that he will be benefitted by the reformatory education, discipline, or other treatment provided by [DJJ]." The court added, "[W]hat impresses me about [DJJ] is the wide variety of options that are available. We have educational options that are certainly not surpassed at the local level. [¶] We have—so we have—Chance will be [in] line to graduate from high school. He will have an opportunity to take college classes, if that is what he desires, but he'll have other options, too. If he's not going to be a college student, there's a fire camp program. There's carpentry programs.

"It's the programming that is available at [DJJ] that I think is most important in the whole—basically for the whole picture of the rehabilitation of Chance, which is, of course, the goal. We need to get Chance up and running. We need to have him become a productive member of society, and we need to give him the training, the education, and the skills and the therapy that's necessary.

"You know, I understand that family counseling can be best done, at least in an in-person point of view, here in San Diego County. But, you know, nowadays with video, video counseling, Skype, telephonic counseling, you know, I think that it's not necessary that it all be face-to-face and everybody in the same room."

The court adjudged Minor a ward of the court (see Welf. & Inst. Code, § 602); and determined the welfare of Minor required that custody be taken from his parent. (See *id.*, § 726, subd. (a)(3).) The court further found that all true findings during the wardship "have been aggregated" (see *id.*, §§ 726 & 1170.1, subd. (a)); that the most serious offense was section 187, subdivision (a), murder, which it further found was a "Category 1 offense"; and that Minor had committed offenses under Welfare and Institutions Code section 707, subdivisions (b), (d)(2), and/or (e).

The court advised Minor that the maximum term for count 1 was 15 years to life, as it had adjudicated the murder to be in the second degree; that the allegation attached to count 1, which, as noted, the court found true, was 25 years to life (see § 12022.53, subd. (d)); and thus, that the total term for count 1 was 40 years to life.

With respect to count 2, attempted murder of Nicolette, the court chose the middle term of seven years, based on the fact Minor had no prior criminal record. The court then imposed the 20-year enhancement based on its true finding of the allegation attached to count 2, use of a firearm in its commission (see § 12022.53, subd. (c)), making Minor's total term "40 to life plus 27 years."

B.  Guiding Principles

When a minor is adjudged a ward of the juvenile court, "the court may make any reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor."  (Welf. & Inst. Code, § 727, subd. (a)(1).)  In determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history."  (*Id.*, § 725.5.)  The court may also consider public safety.  (*Id.*, § 202, subd. (b).)  The court has a wide range of options available for placing its wards, including probation, placement in a relative's home, foster home, licensed community care facility, or group home (*id.*, § 727, subd. (a)); commitment to "a juvenile home, ranch, camp, or forestry camp" or "the county juvenile hall" (*id.*, § 730, subd. (a)); or commitment to DJJ.  (*Id.*, § 731, subds. (a)(4) & (c); see *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306 (*Lara*).)

In order to commit a minor to DJJ, a "court [must be] fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he [or she] will be benefited by the reformatory educational discipline or other treatment provided by [DJJ]."  (Welf. & Inst. Code, 734; see *In re Eddie M.* (2003) 31 Cal.4th 480, 488 (*Eddie M.*) [noting a "court must find that [DJJ] would likely benefit the ward"].)  In addition, the record must show that "less restrictive alternatives would be ineffective or inappropriate.  [Citation.]"  (*Lara, supra*, 4 Cal.5th at p. 306.)

Although there must be evidence in the record that less restrictive alternatives would be inappropriate or ineffective, "there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted."  (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)  Thus,

36

"if there is evidence in the record to show a consideration of less restrictive placement was before the court, the fact the judge does not state on the record his [or her] consideration of those alternatives and reasons for rejecting them will not result in reversal." (*In re Teofilio* (1989) 210 Cal.App.3d 571, 577.)

We review a court's decision to commit a minor to DJJ for abuse of discretion. (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395 (*Michael D.*).) "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.]" (*Ibid.*) A reviewing court must examine the evidence at the disposition hearing in light of the purposes of the juvenile court law. (*Ibid.*) Those purposes include (1) the protection and safety of the public, and (2) rehabilitation of the minor through care, treatment, and guidance which is consistent with the minor's best interest, holds the minor accountable for his or her behavior, and is appropriate for the circumstances. (Welf. & Inst. Code, § 202, subds. (a), (b) & (d).) The court may also consider punishment that is consistent with rehabilitative purposes and a restrictive commitment as a means of protecting the public safety. (See *id.*, subd. (b); *Michael D., supra*, at p. 1396; *In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1564.)

C. <u>Analysis</u>

Here, the court expressly found that commitment to DJJ was in Minor's best interest, as it had myriad programs that would benefit him; and that less restrictive alternatives were not as effective or appropriate. (See Welf. & Inst. Code, § 734; *Lara, supra*, 4 Cal.5th at p. 306; *Eddie M., supra*, 31 Cal.4th at p. 488.) Substantial record evidence supports these findings.

37

We note the court—which also presided over the adjudication phase of the case—had a wide-range of information available to it when considering Minor's placement, all of which the court specifically noted had been considered in making its disposition of Minor, including the Social Study of Minor prepared by probation, the People's dispositional statement, the testimony of Officer Pinedo and Agent Farmer, and Dr. Lehman's pre-adjudication report, among other information.

Officer Pinedo's testimony at the disposition hearing showed that Minor was considered by probation for programs less restrictive than DJJ, including short-term residential treatment and YOU. Officer Pinedo testified that Minor was found unsuitable for such alternative programs by the screening committee based not only on Minor's mental health needs and his need for cognitive therapy to address his violent and aggressive behavior, but also because of the seriousness of the offenses he committed against his father and mother, which is a factor that may be, and was, considered in Minor's placement.

Indeed, as we have summarized *ante*, Minor, without provocation (as found by the trier of fact), fired five bullets at his father from a distance of about six feet, striking his father four times in the leg, hand, and torso/chest area. Minor committed the homicide after he and his father had gone out to dinner without incident, and after his father had returned earlier that day from a multiday business trip. Minutes before the shooting, Minor's father had gone outside not to retrieve a tool or weapon to harm Minor, as he testified, but instead to retrieve Nicolette's cellphone charger, as she requested.

As noted, the court found Minor's father had *not* been physically violent toward Minor, including minutes before Minor fired the weapon, despite

38

Minor's claims otherwise.  Nor had Minor's father been verbally abusive when he raised his voice at, or imposed punishment on, Minor for "trivial transgressions" as a result of Minor's failure to do his chores and otherwise follow direction.

As also summarized *ante*, Minor also attempted to murder Nicolette during the incident on at least two separate occasions.  Putting aside any possible murder attempt in the master bedroom (see fn. 2 *ante*), the first such attempt occurred when he confronted his mother in the living room area, shortly after killing his father.  In this incident, Minor, with his finger on the trigger, assumed a "shooter's stance," and pointed the gun directly at his mother.  Audio from the surveillance camera picked up the sound of a clicking noise coming from the gun, either because the gun was jammed or, as found by the juvenile court, more likely out of ammunition.

The second such attempt occurred after Minor went back into the master bedroom, reloaded the gun and dumped an additional magazine and ammunition into his school backpack.  Minor then went back into the living room area and, shortly before leaving the home, fired a bullet that went through Stephen's door near the doorknob, about four feet off the floor, and lodged into the wall in Stephen's room.  Minor fired the bullet knowing his mother was behind the door, as she was yelling at the same time she was beginning to open the door to "talk" Minor "down."

The record shows Minor fired the bullet to let his mother know he was still in the home and to facilitate his "clean" get away.  Minor attempted to murder his mother despite the lack of any evidence that she, unlike the allegations against her husband, had ever been physically or verbally abusive toward him.  As a result of the true findings made by the court on counts 1

and 2, and the allegations appended to each count, Minor was advised he was facing a maximum sentence of 40 years to life plus 27 years.

In addition, the record shows there was ample evidence to support the court's finding that Minor's mental health, emotional, behavioral, and educational needs could be met at DJJ based on the wide-range of programs or interventions DJJ offered in an *individually* developed case plan. According to Agent Farmer, this case plan was the result of input from Minor, his family members, a comprehensive initial 45-day assessment, as well as all other information and documentation related to Minor, all of which were designed to meet the goal of rehabilitation in order to have Minor reenter the community.

Agent Farmer testified the case plan would include various programs or interventions for Minor including cognitive behavioral programs to help him with anger issues, to address antisocial attitudes, and to develop self-monitoring and regulation skills. DJJ also provided trauma-focused treatment, victim awareness, employment, education, mental health, and reentry group programs.

Overall, the record shows the court was impressed by the higher level of care Minor would receive in DJJ when compared to the other, less restrictive placements. (See *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486 [noting a juvenile court "is only required to find if it is probable a minor will benefit from being committed [to DJJ]," and further noting "[t]here is no requirement that the court find exactly how a minor will benefit from being committed to DJJ"].) Moreover, contrary to Minor's contentions otherwise, the court did make a finding that the treatment and programs Minor would receive at DJJ "surpassed" the programs and treatment available to him at the "local level," including at YOU.

40

In sum, the juvenile court considered all the proper factors prior to placing Minor with DJJ, after finding that less restrictive alternatives were ineffective or inappropriate. (See Welf. & Inst. Code, § 734; *Lara, supra*, 4 Cal.5th at p. 306; *Eddie M., supra*, 31 Cal.4th at p. 488; *Michael D., supra*, 188 Cal.App.3d at p. 1395.) Because the court's decision as to each factor was supported by the record evidence, and because the record shows it properly exercised its discretion in considering Minor's placement, we find no abuse of discretion.

## III

*The Court Properly Imposed the Firearm Enhancements in Counts 1 and 2*

Minor next contends the case should be remanded because the court allegedly was unaware that it had the discretion not only to strike the firearm enhancements attached to counts 1 and 2 for murder and attempted murder, respectively, but also to replace those enhancements with lesser, uncharged enhancements. We find this contention unavailing.

Initially, we conclude Minor forfeited this claim of error by failing under section 1385[8] to object at the disposition hearing on these specific grounds. (See *People v. Scott* (1994) 9 Cal.4th 331, 353 [noting in the absence of an objection, a defendant on appeal forfeits any "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"]; see also *Lara, supra*, 54 Cal.4th at pp. 900–901 [noting section 1385 permits "courts to dismiss, or 'strike,' factual allegations relevant to sentencing, such as those that expose the defendant to an increased sentence"].)

---

[8] Subdivision (b)(1) of section 1385 provides: "If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)."

41

Moreover, we reject this contention on the merits.[9]

Initially, we note the court in the instant case announced its findings at the conclusion of the April 5, 2019 disposition hearing, *after* the amendment to section 1385 had become effective. (See Stats. 2018, Ch. 1013 (Sen. Bill No. 1393), § 2, eff. Jan. 1, 2019.) When a record is silent, such as in the instant case, a "trial court is presumed to have been aware of and followed the applicable law" when exercising its discretion. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496 [recognizing "general rules concerning the presumption of regularity of judicial exercises of discretion apply to sentencing issues"]; accord *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1521–1523 [noting a court of review cannot presume error when the record does not establish on its face that the trial court misunderstood the scope of its discretion].)

Moreover, we note the court during disposition exercised its discretion when advising Minor of the possible sentence he was facing in this case. As noted *ante*, the court made true findings on counts 1 and 2, the murder and attempted murder of Minor's father and mother, respectively, and on the gun-use allegations appended to each count. However, on count 2, the court exercised its discretion when it imposed the middle term of seven years, as opposed to the upper term of nine years. In so doing, the court recognized Minor's lack of criminal history was a mitigating factor warranting the middle term.

In exercising that discretion, the court also found that Minor's "actions leading up to the shooting show . . . he armed himself with a firearm, he

---

9    Because we reach the merits, we reject Minor's claim that his counsel was ineffective for failing to object to the imposition of the enhancements under section 12022.53.

42

positioned himself to gain an advantage, and then he shot [his father] five times with a coup de grace in the end." We thus conclude from this record that the court was aware of its discretion when imposing sentence on counts 1 and 2, *and* the enhancements appended thereto, but found Minor's actions warranted imposition of the gun-use allegations, as charged in the petition.

Minor also contends the juvenile court misunderstood the scope of its discretion and requests that we remand for the court to consider whether to substitute lesser enhancements under section 12022.53 for his gun use, as opposed to the enhancements actually found and imposed by the court as alleged in the petition. Minor principally relies on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) to support this contention. The People assert *Morrison* was wrongly decided and should not be followed. We agree with the People.

"On October 11, 2017, Governor Brown signed Senate Bill No. 620 (2017-2018 Reg. Sess.), which amended sections 12022.5 and 12022.53 to provide trial courts with the discretion to strike a firearm enhancement or finding. [Citation.] Senate Bill No. 620 added the following language to both statutes: 'The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, *strike or dismiss an enhancement* otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law.' " (*Morrison, supra,* 34 Cal.App.5th at pp. 221–222, italics added.) This language was added to section 12022.53 as subdivision (h).

Section 12022.53 " 'sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies, including . . . murder [and/or attempted murder:] a 10-year prison term for personal use of a

43

firearm, even if the weapon is not operable or loaded (*id.*, subd. (b)); a 20-year term if the defendant "personally and intentionally discharges a firearm" (*id.*, subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes "great bodily injury" or "death, to any person other than an accomplice" (*id.*, subd. (d)). For these enhancements to apply, the requisite facts must be alleged in the information or indictment, and the defendant must admit those facts or the trier of fact must find them to be true.' [Citation.] Section 12022.53, subdivision (f) provides, 'Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment . . . .' " (*Morrison*, *supra*, 34 Cal.App.5th at p. 221.)

In *Morrison*, the jury found true only the enhancement allegation under section 12022.53, subdivision (d). (*Morrison*, *supra*, 34 Cal.App.5th at p. 221.) After the trial court recalled the sentence to exercise its discretion as provided in section 12022.53, subdivision (h), the court declined to strike the firearm enhancement. (*Morrison*, at p. 220.) On appeal, the defendant argued the "case should be remanded for resentencing because the court did not understand the scope of its discretion" given its failure to consider whether to modify the enhancement to a " 'lesser included' enhancement under section 12022.53, subdivision (b) or (c), which carry lesser terms of 10 years or 20 years, respectively." (*Morrison*, at p. 221.)

The *Morrison* court agreed with the defendant, citing case law providing a "court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient

44

evidence."[10] (*Morrison, supra,* 34 Cal.App.5th at p. 222.) The *Morrison* court further relied on our high court's analysis in *People v. Marsh* (1984) 36 Cal.3d 134 (*Marsh*). (See *Morrison,* at p. 223.)

Like our colleagues in the Fifth District Court of Appeal, we do not find this analysis persuasive. (*People v. Tirado* (2019) 38 Cal.App.5th 637, 644, review granted Nov. 13, 2019, S257658 (*Tirado*); see *People v. Garcia* (2020) 46 Cal.App.5th 786, 790–791 (*Garcia*) [recognizing the split between *Tirado* and *Morrison* but agreeing with *Tirado* that "section 12022.53, subdivision (h) does not grant a trial court the discretion to substitute lesser included enhancements, at least where the greater enhancement is legally and factually valid"].)

We agree with the statutory interpretation set forth in *Tirado* and *Garcia.* The plain language of Penal Code sections 1385 and 12022.53, subdivision (h) authorizes the trial court to either dismiss or strike an enhancement. "There is nothing in either statute that conveys the power to change, modify, or substitute a charge or enhancement." (*Tirado, supra,* 38 Cal.App.5th at p. 643; see *Garcia, supra,* 46 Cal.App.5th at p. 791 [noting section 12022.53, subdivision (h) only confers the authority to "strike or dismiss" a firearm enhancement set forth in section 12022.53].)

The *Tirado* court's comparison of the language in section 1385 with language in other statutes permitting a court to modify a charge or enhancement (e.g., §§ 1260 & 1181, case (6)) makes this point. (*Tirado,*

---

10    We note that neither of these circumstances are present here, as the court, in connection with count 1, made a true finding under subdivision (d) of section 12022.53, as was charged in the petition; and in count 2, made a finding under subdivision (c) of this statute, as was also charged in the petition. As further noted, the true findings with respect to both enhancements are supported by ample record evidence.

*supra*, 38 Cal.App.5th at p. 643; see *Garcia*, *supra*, 46 Cal.App.5th at p. 791 [noting the statutory language in section 12022.53, subdivision (h) "says nothing about substituting or modifying enhancements" as was done in *Morrison*].)

The case law upon which *Morrison* relied — i.e., that a "court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient evidence" (*Morrison*, *supra*, 34 Cal.App.5th at p. 222) — did not arise in the context of power statutorily conferred upon the court under section 1385. In other words, the authority discussed in those cases is independent of this statute's authority and not circumscribed by its language.

We also do not see how *Marsh* supports the position adopted in *Morrison*. In *Marsh*, our high court merely explained that a trial court has "a broad range of sentencing options" in exercising its discretion under section 1385 to strike allegations. (*Marsh*, *supra*, 36 Cal.3d at pp. 143–144.) We find nothing in the opinion indicating that a trial court's section 1385 discretionary power includes the imposition of an allegation, action, or enhancement different from that charged and presented to the trier of fact.

For these reasons, we decline Minor's invitation to remand the case to the juvenile court to allow it to exercise its discretion in deciding whether to impose lesser firearm enhancements either under subdivision (b) and/or (c) of section 12022.53 with respect to count 1, and/or to impose the lesser firearm enhancement under subdivision (b) of this statute with respect to count 2.

## DISPOSITION

The court's April 5, 2019 disposition order is affirmed.


                                                    BENKE, Acting P. J.

WE CONCUR:



HUFFMAN, J.



IRION, J.


47

# APPENDIX "A"

